## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORMENT SECURITY GROUP, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TRAVELERS CASUALTY AND ) <br> INSURANCE COMPANY, et al., ) <br> ) <br> Defendants. ) | Civil Action No. 05-1715 (JMF) |
| PCC CONSTRUCTION ) <br> COMPONENTS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ARCH INSURANCE COMPANY, ) <br> ) <br> Defendant. ) | Civil Action No. 06-1085 (JMF) |

### MEMORANDUM OPINION

This case was referred to me for all purposes by consent of the parties. On January 22, 2007, by minute order, I consolidated the cases of <u>Norment Sec. Group, Inc. v. Travelers Cas. and Ins. Co.</u> (05-1715) and <u>PCC Constr. Components, Inc. v. Arch Ins. Co.</u> (06-1085) for all purposes.

Currently pending before the Court are (1) a motion by PCC Construction Components ("PCC") to dismiss two counts brought by third-party plaintiff Centex Construction ("Centex") and (2) a motion by Centex to stay one count of PCC's

1

counterclaim to Centex's third-party complaint. For the reasons stated herein, the motion to dismiss will be denied and the motion to stay will be granted.

## I.   BACKGROUND

### A.   The Contracts

On or about March 18, 2002, Centex entered into a written contract with the United States, acting through the General Services Administration ("GSA"), for construction of the E. Barrett Prettyman Courthouse Annex (the "Project"). Norment Complaint (05-1715) [#1] ("Norment Compl.") ¶ 6. Centex, together with Travelers Casualty and Insurance Company ("Travelers"), then executed and delivered a Payment Bond, pursuant to 40 U.S.C. § 3131, for the protection of all persons supplying labor and material on the Project. Norment Compl. ¶ 7. On April 10, 2002, Centex entered into a subcontract with PCC ("PCC Subcontract") for glass and glazing work on the Project. Norment Compl. ¶ 8.

In turn, on May 1, 2002, PCC entered into a sub-subcontract with Norment Security Group ("Norment Sub-Subcontract") to engineer, fabricate, and supply blast resistant and ballistic windows to PCC for the Project. PCC Complaint (06-1085) [#1] ("PCC Compl.") ¶ 4-5. Pursuant to the terms and conditions of the agreement between PCC and Norment Security Group ("Norment"), Norment provided, for the benefit of PCC, a supply bond ("Bond") in the full amount of the purchase order under the sub-subcontract, $2,298,000.00, to "indemnify and save harmless the Obligee from all cost and damage by reason of Principal's failure" to perform its obligations. See PCC Compl. ¶ 6. The Bond was issued by Arch Insurance Company ("Arch"). PCC Compl. ¶ 7.

2

The Norment Sub-Subcontract also created additional obligations for PCC in relation to Centex under the PCC Subcontract. Under the terms of the PCC Subcontract, PCC was obligated to submit monthly notarized Applications for Payment to Centex for reimbursement for all expenditures, including payments to PCC's sub-subcontractors. See Centex Third-Party Claim Against PCC Construction Components, Inc. (05-1715) [#21] ("Centex Third-Party Compl.") ¶ 16-18. In other words, under the PCC Subcontract, PCC was obligated to certify and report to Centex any payments made to Norment under the Norment Sub-Subcontract.

**B.     What Happened under the Contracts**

According to PCC, Norment failed to deliver the windows to the Project worksite as scheduled in the purchase order under the Norment Sub-Subcontract. PCC Compl. ¶ 8-9. Norment allegedly delivered the windows intermittently and ignored the schedule requirements set by PCC that were necessary for PCC to complete its portion of the Project on time. PCC Compl. ¶ 10. Moreover, according to PCC, upon specification testing, the windows provided by Norment leaked, requiring Norment to dismantle the windows and correct the interior seals, resulting in additional delays. PCC Compl. ¶ 13-14. PCC claimed the defective windows and delays caused added costs and damages to PCC of approximately $1.6 million. PCC Compl. ¶ 15.

In contrast, Norment and Centex claim that PCC did not uphold its responsibilities in either the subcontract with Centex or the sub-subcontract with Norment. Specifically, Norment complains that PCC violated the Norment Sub-Subcontract in refusing to pay Norment in full. See Norment Compl. ¶ 12. Centex in turn complains that PCC violated the PCC Subcontract by reporting in its monthly

3

applications for payment from Centex that PCC was paying Norment when in fact it was not. Centex Third-Party Compl. ¶ 14-18, 21-23.

## II.     PROCEDURAL HISTORY

As a complicated government contract dispute with several subcontractors, sureties, and third-party complaints and counterclaims, this case warrants a brief summary of the proceedings relevant to these two motions.

### A.     <u>Litigation and Arbitration between Norment/Arch and PCC (06-1085)</u>

When Norment and PCC were unable to resolve their disputes concerning Norment's alleged deficient performance in delivering windows to specification and PCC's alleged resulting nonpayment, Norment initiated arbitration proceedings with PCC through the American Arbitration Association on April 6, 2005. See Norment Application for Order Confirming Arbitration Award, Civil Action No. 07-58 ("Conf. Arb.") ¶ 9.

On May 20, 2005, as arbitration proceedings continued with Norment, PCC nonetheless filed suit in Maryland state court against Arch, Norment's bond, for damages of $1,617,339.58 resulting from Norment's delays in delivering windows and for indemnification from any claims by Centex against PCC. See PCC Compl. ¶ 15. Arch removed the case to federal court for the district of Maryland on June 28, 2005, and on July 7, 2005, the Maryland federal district court granted a joint motion to stay the action pending the ongoing arbitration. Order, 6/16/2005 (Titus, J.) [#1] ("Titus Order") at 1. In April of 2006, PCC moved to lift the stay of the action, stay the arbitration proceedings, and transfer the case to the federal district court for the District of Columbia. Id. On June 15, 2006, the Maryland federal district court granted PCC's motion in part, lifting the

stay on the action and transferring the case to the district court for the District of Columbia. Titus Order at 2.

Meanwhile, on June 2, 2006, prior to their final arbitration hearing, Norment and PCC reached a settlement that resolved a portion of their disputes, whereby PCC acknowledged that Norment was owed $432,187.11 for the balance of the Purchase Order and $64,602.86 for the additional work Norment provided for the Project. Conf. Arb ¶ 11-12.  On July 11, 2006, the Arbitration Panel adopted the Agreement and awarded Norment $496,489.97. Conf. Arb. ¶ 14.

To further complicate matters, Norment then filed a request to confirm the arbitration award under Civil Action 07-0058, a case not consolidated with the actions at issue.  PCC did not dispute that Norment was owed the amount specified in the Agreement but argued that it had agreed with Norment to suspend payment until Norment's other "pass-through" claims against Centex were resolved (discussed below). By minute order in that case on June 11, 2007, the Court confirmed the arbitration award with the understanding that Norment may not initiate collection activities against PCC until all presently pending litigation is resolved.  In the meantime, PCC's damages and indemnification claims remain pending against Arch for Norment's performance under the Norment Sub-Subcontract in Civil Action 06-1085.

**B.     Litigation between Norment and Centex/Travelers (05-1715)**

On August 29, 2005, while still engaged in the aforementioned arbitration proceedings with PCC, Norment also filed suit in the federal district court for the District of Columbia against Centex and its surety Travelers for the unpaid amounts on Norment's sub-subcontract with PCC and for related extra work, this time in the amount

5

of approximately $1.3 million. See Norment Compl. ¶ 17. After the court denied a request to stay the proceedings pending the outcome of the arbitration between Norment and PCC, Centex then filed an amended answer and counterclaim against Norment, alleging that Norment failed to coordinate its work with Centex and the other trades on the Project, resulting in additional management and administrative costs as well as reimbursement costs paid to subcontractors affected by Norment's alleged failures. Centex Amended Answer and Counterclaim [#15] at 4-6.

**C.**     **Case Consolidation and Third-Party Litigation between Centex and PCC**

Thus, two cases proceeded in this court relating to the Project and the obligations of Centex (Travelers) as general contractor, PCC as subcontractor, and Norment (Arch) as sub-subcontractor. In 06-1085, PCC pursued claims against Norment (Arch) for failing to deliver windows according to specification on time, while Norment secured an arbitration ruling against PCC for certain costs owed on the Norment sub-subcontract, the award of which was stayed pending the outcome of the second case between Norment and Centex (Travelers). In that case, 05-1715, Norment brought a complaint against Centex (Travelers) for nonpayment by PCC under the sub-subcontract, to which Centex counterclaimed against Norment for causing additional costs due to its failure to perform under the sub-subcontract.

Centex moved to consolidate the two cases, which the Court initially granted solely for purposes of discovery, see Minute Order, 10/26/2006, and then for all purposes including trial, see Minute Order, 1/22/2007. Following consolidation, Centex brought the dispute between the three parties full circle and filed a third-party complaint against PCC for: (1) contractual indemnification, (2) fraud, (3) negligent misrepresentation, (4)

6

unjust enrichment, and (5) breach of contract. Centex Third-Party Compl. ¶ 7-36.  PCC, of course, then filed a counterclaim against Centex for: (1) indemnification, (2) breach of contract, and (3) costs associated with delays in the overall completion of PCC's work. PCC Construction Components Inc.'s Third-Party Counterclaim Against Centex Construction Co., Inc. [#36] ¶ 6-31.

In sum, the three parties of these consolidated cases—Centex (Travelers), PCC, and Norment (Arch)—each have claims against the other two parties. Norment brought suit against Centex in 05-1715 and proceeded with arbitration with PCC (the award of which is stayed pending the outcome of litigation).  Centex brought a counterclaim against Norment and a third-party complaint against PCC, also in 05-1715.  PCC then filed a third-party counterclaim against Centex while maintaining separate claims against Norment in 06-1085.

It is in this posture that the Court turns to the two motions at issue.

## III.   PCC'S MOTION TO DISMISS

PCC moves to dismiss two of Centex's claims, for fraud and negligent misrepresentation.[1] See PCC Construction Component Inc.'s Motion to Dismiss Centex Construction LLC's Third-Party Complaint [#27] at 1-2.  PCC asserts identical grounds for dismissal of both claims: (1) failure to plead with adequate particularity and (2) duplicity of these tort claims with the breach of contract claim.

### A.   **Dismissal Based on Failure to Plead with Adequate Particularity**

First, PCC moves to dismiss Centex's claims for fraud and negligent misrepresentation on the grounds that Centex failed to identify with adequate

---

[1] PCC also moved to dismiss Centex's claim for unjust enrichment, but subsequent pleadings by both parties resulted in agreement that this count was moot.

particularity the specific time of the alleged false representations and the identities of any individuals involved in making these representations. PCC Construction Components Inc.'s Memorandum of Points and Authorities in Support of Its Motion to Dismiss Centex Construction LLC's Third-Party Complaint ("PCC Mem. Dismiss") at 4.  Centex opposes the motion on the grounds that it met the heightened pleading requirement of Federal Rule 9(b) by providing adequate detail of the time, place, and content of the alleged false representations. Memorandum in Opposition to PCC Construction Components Inc.'s Motion to Dismiss [#28] ("Centex Opp. Dismiss") at 3.

Under Federal Rule of Civil Procedure 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).  The D.C. Circuit has held that this heightened pleading standard, read in conjunction with the liberal notice pleading requirement of Rule 8(a), "requires that the pleader . . . state the time, place and content of the alleged false misrepresentations, and fact misrepresented and what was retained or given up as a consequence of the fraud." United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (internal citations omitted).

Leave to amend, rather than dismissal, is often the appropriate remedy when disputes arise between parties over the particularity requirements of Rule 9(b). See Shekoyan v. Sibley Intern. Corp., 409 F.3d 414, 418 (D.C. Cir. 2005).  In particular, the D.C. Circuit disfavors dismissal under Rule 9(b) "if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." United States ex rel. McCready, M.D. v. Columbia/HCA Healthcare Corp.,

251 F. Supp. 2d 114, 116 (D.D.C. 2003) (citing United States ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385-86 (D.C. Cir. 1981)).

In Miller v. Holzmann, Civ. A. No. 95-1231, 2006 WL 568722 (D.D.C. Mar. 9, 2006), the court held that the United States and its relator failed to meet the requirements of Rule 9(b) when the plaintiff did not identify specific representatives of the defendant company who allegedly engaged in acts of bid-rigging and when the plaintiffs did not allege the specific time when these representatives agreed to engage in the scheme. Id. at *8-*9. These defects required the plaintiff to amend its complaint to provide sufficient details of the alleged fraud. Id.

In this case, Centex alleges that PCC submitted payment applications to Centex that contained signed certifications that:

> to the best of [PCC's] knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents[,] that all amounts have been paid by [PCC] for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

Centex Third-Party Compl. ¶ 15. Centex alleges that these certifications made by PCC were false, that PCC knew that they were false and made them with the intent to deceive Centex, and that Centex reasonably relied to its detriment on the false statements of PCC when making further payments to PCC. Centex Third-Party Compl. ¶ 16-18. Additionally, Centex alleges that PCC had a duty to Centex to exercise reasonable care in signing the applications for payment and that PCC violated that duty because it knew or should have known that it had not paid Norment all the contractually required amounts. Centex Third-Party Compl. ¶ 21-22.

Under the requirements of Rule 9(b) as interpreted by this jurisdiction, the complaint against PCC fails to plead fraud with adequate particularity. Specifically, Centex does not specify the dates of the payment applications it alleges to contain false statements, nor which PCC representatives signed the payment applications. Thus, the pleadings fail to meet the particularity requirements that the pleader specify the time of the alleged false representations and identify the individuals involved as set forth in Martin-Baker Aircraft and Miller. See Martin-Baker Aircraft, 389 F.3d at 1256; Miller, 2006 WL 568722 at *9.

As dismissal is viewed with disfavor, however, despite the flaws in Centex's third-party complaint, this Court is reluctant to dismiss Centex's claims altogether on these grounds. Centex does make clear the content and place of the alleged false representations, its reliance on them, and damages suffered as a result. Centex Third-Party Compl. ¶ 14-18, 21-23. Centex also claims to have substantial prediscovery evidence of the circumstances of the false representations, namely the payment applications themselves and PCC's admission in a separate arbitration action that it did not in fact pay Norment. Centex Opp. Dismiss at 4. Thus, while the third-party complaint is technically inadequate in part, it would be inappropriate to dismiss Centex's motions with prejudice on that basis alone without providing an opportunity for Centex to remedy its complaint. Therefore, the Court shall grant Centex leave to amend its complaint, and PCC's motion to dismiss will be denied.

**B.     Duplicity of Claims**

Alternatively, PCC moves to dismiss Centex's claims of fraud and negligent misrepresentation on the grounds that those claims are duplicative of the breach of

contract claim. PCC's Mem. Dismiss at 5-6. Centex opposes dismissal on these grounds because the tort claims of fraud and negligent misrepresentation, though relying on similar underlying facts, state a claim for relief separate and independent of the breach of contract claim. Centex Opp. Dismiss at 6-9.

To maintain a tort claim in addition to a breach of contract claim, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages. See Regency Commc'ns, Inc. v. Cleartel Commc'ns, 160 F. Supp. 2d 36, 42 (D.D.C. 2001) (citing Bridgestone/Firestone v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)).

In this case, Centex's fraud claim easily satisfies the third Regency requirement because Centex demands punitive damages in the amount of $1,000,000 for PCC's alleged fraud, and these damages would be unrecoverable as contract damages. See Centex Third-Party Compl. at ¶ 7. On these grounds, then, the fraud claim stands.

Centex, however, does not seek any special damages related to its claim for negligent misrepresentation, so the issue turns on whether PCC's certification under oath that it had paid its subcontractors either invokes a legal duty separate from the contractual duty to pay those subcontractors, or is collateral or extraneous to the contract. The duty not to defraud or make misrepresentations certainly exists apart from the duty to perform under a contract, but here the two are so interrelated that the answer is not immediately apparent. The Court need not reach this question, however, if leave is given to Centex to amend its complaint. Once Centex has pled fraud and negligent misrepresentation with

11

sufficient particularity, it should become clearer whether the negligent misrepresentation claim states a claim separate and independent from the breach of contract claim.

## IV.     MOTION TO STAY

PCC has filed a counterclaim against Centex's third-party complaint, alleging in Count III Centex has not paid PCC the additional $277,520 incurred as a result of delays caused by Centex and/or GSA. Centex moves the Court to stay Count III of PCC's counterclaim on the grounds that PCC is required by specific terms of its subcontract with Centex to wait until the contractually prescribed dispute resolution procedures with GSA have been exhausted before seeking reimbursement for delay costs from Centex. <u>Centex Construction LLC's Motion to Stay Count III of PCC's Counterclaim</u> [#41] ("Centex Mot. Stay") at 2.

During the Project, GSA granted Centex a time extension to accommodate re-design work by GSA. <u>Id.</u> at 5. Centex then invited its subcontractors, including PCC, to submit cost proposals for their additional costs as a result of the delay to be included in Centex's submission to GSA. <u>Id.</u> PCC accepted the invitation and submitted a cost proposal in its submission to the GSA for $277,520. <u>Id.</u> As such, Centex included PCC's cost proposal in its submission to the GSA seeking compensation from GSA's extending the time within which Centex was to complete its contractual obligations. <u>Id.</u>

Centex points to the clear language of the subcontract between Centex and PCC, where Article 3.E explicitly provides,

> [s]hould [PCC's] performance of this Agreement be . . . delayed or disrupted by any acts or causes which would entitle [Centex] to an extension of time under the Contract Documents, [PCC] shall receive an equitable extension of time for the performance of this Agreement but shall not be entitled to any increase in the Agreement Price or to damages or additional compensation as a

12

>     consequence of such delays or disruption, unless [GSA] is liable
>     and pays for such delays and disruptions. Provided [PCC] complies
>     with the notice requirements hereinafter set forth, [Centex] will
>     pay [PCC] the amount allowed and paid such by [GSA] for
>     [PCC's] delay or disruption.

Id. at 5-6.

In further support of its position, Centex cites several cases where similar clauses were upheld. See, e.g., Crown Coat Front Co. v. United States, 386 U.S. 503, 522 (1967) (finding that "if the claim filed by the contractor . . . was a claim arising under the contract and was therefore subject to administrative determination, (1) its right to bring a civil action first accrued when [the relevant administrative agency] finally ruled on its claim"); Bethlehem Steel Corp. v. Grace Line, Inc., 416 F.2d 1096, 1106-07 (D.C. Cir. 1969) (referring a claim to arbitration "out of respect for [the] binding agreement between the parties to submit the subject of reference. . . . That course would comport well with fundamental policy underlying the well settled rule that claims referable under the disputes clause for administrative adjustment cannot be entertained judicially until the required administrative procedures have been exhausted.").

Centex also cites the nearly parallel case of Seal & Co., Inc. v. A.S. McGaughan Co., Inc., 907 F.2d 450 (4th Cir. 1990), where the court found that the district court should have stayed an action brought by a subcontractor pending the outcome of contractual dispute resolution proceedings. Id. at 451. The court concluded that the parties were "contractually bound to exhaust the administrative procedures available to them and, consequently, that the district court erred when it denied [defendant's] motion to stay the proceedings pending the exhaustion of those procedures." Id. at 455.

Thus, according to Centex, PCC must await resolution of Centex's claims, including that at issue here submitted by PCC, with GSA before PCC can assert a claim against Centex due to GSA's delay and subsequent non-payments to PCC. Centex Mot. Stay at 8-9. On the other hand, PCC argues that staying the claim would "only delay complete adjudication of the claims now pending before the Court." PCC Construction Components Inc.'s Opposition to Centex's Motion to Stay Count III of Its Counterclaim at 2. After all, says PCC, "time is money." Id. at 3. This is hardly a basis for the Court to abrogate the binding agreement that the parties entered into voluntarily, and PCC provides no other basis for the Court to do so. Moreover, PCC does not address the possibility that the same claim could be resolved two different ways, one by the GSA and the other by this Court.

PCC's claim for damages caused by delay arises under the contract, and because GSA – the relevant administrative agency – has not yet ruled on Centex's claim, which includes PCC's claim, then PCC's prosecution of the very same claim should await the GSA's determination. Centex's request to stay Count III of the counterclaim will therefore be granted.

## V.   CONCLUSION

For the foregoing reasons, PCC Construction Component Inc.'s Motion to Dismiss Centex Construction LLC's Third-Party Complaint [#27] will be denied and Centex shall be granted leave to amend its third-party complaint in accordance with this Memorandum Opinion within thirty days, or no later than September 24, 2007. Furthermore, Centex Construction LLC's Motion to Stay Count III of PCC's Counterclaim [#41] will be granted. Centex shall be ordered to inform the Court of

GSA's resolution of Centex's submitted claims within seven days of GSA's notification to Centex of its decision.

    An Order accompanies this Memorandum Opinion.


                                                               _____/s/_____

                                                               JOHN M. FACCIOLA
                                                               UNITED STATES MAGISTRATE JUDGE

Dated: August 24, 2007